JUDGE SCHOFIELD

Andrew M. Calamari
Lara Shalov Mehraban
Sandeep Satwalekar
Preethi Krishnamurthy
Maureen P. King
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0111 (King)



17 CV 4950

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

    -against-

RENWICK HADDOW, BAR WORKS, INC.,
BAR WORKS 7TH AVENUE, INC., and
BITCOIN STORE, INC.,

               Defendants,

    -and-

BAR WORKS CAPITAL, LLC,

               Relief Defendant.

------------------------------------------------------------x

:
:
:   COMPLAINT
:
:   17-CV-     (     )
:
:
:   JURY TRIAL
:   DEMANDED
:
:
:
:
:
:
:

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Renwick Haddow ("Haddow"), Bar Works, Inc. ("Bar Works"), Bar Works 7th Avenue,

Inc. ("7th Avenue"), and Bitcoin Store, Inc. ("Bitcoin Store") (collectively, "Defendants") and relief

defendant Bar Works Capital, LLC ("Capital" or "Relief Defendant"), alleges as follows:

## SUMMARY

1.      Defendant Haddow—who had previously been disqualified from serving as a company director in the U.K. (the "U.K.") and had been sued by a U.K. regulator for misleading investors in an unrelated investment scheme—used the United States as a base to fraudulently raise over $37 million from investors.

2.      To sell the investments, Haddow first created and operated a broker-dealer, InCrowd Equity, Inc. ("InCrowd"), without registering it as a broker-dealer with the Commission.

3.      Haddow staffed InCrowd with sales representatives and compensated them partly through commissions dependent on the amount of investor funds the representatives raised for various securities offerings.

4.      Haddow then used InCrowd (and later other marketers) to sell securities in at least two companies he created and controlled: defendant Bitcoin Store, a purported platform for customers to hold and trade the digital currency bitcoin, and defendant Bar Works, a purported chain of co-working spaces located in former bars and restaurants that at times operated through another Haddow-controlled entity, defendant 7th Avenue.

5.      InCrowd's sales representatives cold-called prospective investors and touted the securities of Bitcoin Store and Bar Works.

6.      Haddow controlled the written offering materials—including press releases and offering memoranda—for the Bitcoin Store and Bar Works securities offerings.

7.      These materials contained no mention of Haddow, touted the backgrounds of senior managers who appear to be non-existent, and misrepresented other material facts about Bitcoin Store's and Bar Works' operations, as Haddow knew or recklessly disregarded.

8.      Defendants collectively raised over $37,797,220.94 from the fraudulent Bitcoin Store and Bar Works offerings, approximately $1.55 million of which Haddow used to purchase real property in San Francisco in relief defendant Capital's name for a purported Bar Works location.

## VIOLATIONS

9.      By virtue of the conduct alleged here, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; defendant Haddow has aided and abetted violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 by Bar Works, 7th Avenue, and Bitcoin Store; defendant Haddow is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 10(b) and Rule 10b-5 by Bar Works, 7th Avenue, and Bitcoin Store; and defendant Haddow is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)] by InCrowd.

10.      Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]. The Commission seeks to permanently enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and seeks an order requiring Defendants and Relief Defendants to disgorge all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with

prejudgment interest. The Commission also seeks civil penalties against Defendants under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

12.     To maintain the *status quo* and preserve assets sufficient for Defendants to pay disgorgement, prejudgment interest, and civil penalties and for Relief Defendant to pay disgorgement and prejudgment interest in accordance with any final judgment of this Court, the Commission seeks emergency relief: (i) imposing asset freezes on Defendants and Relief Defendant, (ii) requiring Defendants and Relief Defendant to repatriate funds and other assets now located outside the United States, (iii) requiring Defendants to provide the Commission with a sworn accounting, and (iv) preventing Defendants and Relief Defendant from destroying, altering, or concealing documents.

## JURISDICTION AND VENUE

13.     The Commission brings this action under the authority conferred by Securities Act Section 20 [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

14.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York. Among other things, Haddow conducted his unlawful practices from New York, New York. In addition, Haddow lives in New York, New York.

## FACTS

**I.   Defendants and Relief Defendant**

16.     **Haddow**, a U.K. citizen, resides in New York, New York. During the Commission's investigation, Haddow asserted his Fifth Amendment privilege against self-incrimination.

17.     **Bar Works** is a Delaware corporation with its principal place of business in New York, New York. Haddow owns and at all relevant times has controlled Bar Works, which offers short-term, shared office space in renovated bars in New York City and San Francisco. Bar Works has opened at least two locations with workspaces: on 39th Street and 46th Street in Manhattan.

18.     **7th Avenue** is a New York corporation with its principal place of business in New York, New York. Haddow formed and at all relevant times has controlled 7th Avenue, which appears to have been created in connection with a Bar Works location on 7th Avenue in Manhattan.

19.     **Bitcoin Store** is a Delaware corporation with its principal place of business in New York, New York. Haddow formed, owned, and at all relevant times has controlled Bitcoin Store.

20.     **Capital** is a Delaware limited liability company that uses a New York, New York address.

**II.   Other Relevant Entities**

21.     **InCrowd** is a Delaware corporation with its principal place of business in New York, New York. Haddow incorporated InCrowd and at all relevant times owned and controlled it.

22.     **Bar Works Management, Inc. ("Bar Works Management")** is a New York corporation founded by Haddow with its principal place of business in New York, New York. Bar Works held out Bar Works Management as Bar Works' wholly-owned subsidiary.

### III.  Haddow Gained Disqualification and Notoriety in the U.K. for Previous Misconduct.

23.     In approximately November 2008, the U.K.'s Insolvency Service—a U.K. government agency whose work includes administering bankruptcies and disqualifying unfit directors in corporate failures—disqualified Haddow from serving as a director of a company for eight years.

24.     Haddow's misconduct as finance director of Branded Leisure plc, a company that would purportedly operate certain venues targeted at women ages 18 to 35, served as the basis of the disqualification.

25.     On December 10, 2008, the U.K. Insolvency Service issued a news release announcing the disqualification and noted: "The Schedule of Unfit Conduct which formed a part of the Disqualification Undertaking given by Mr. Haddow included…that he caused and/or allowed [Branded Leisure] to make inaccurate and misleading announcements…as to the progress of the company's building work, sales performance of the company, and the financial performance of the company…[and] [t]hat he caused and/or allowed the company to make false representations in a Board minute…in particular as to the financial position and prospects of the company, which caused investors to lose £500,000 in [a certain fund]."

26.     Shortly afterwards, the British press published articles about Haddow's disqualification.

27.     In July 2013, the U.K.'s Financial Conduct Authority ("FCA"), the Commission's approximate counterpart in the U.K., filed a court action against Haddow and others based on misconduct unrelated to Branded Leisure and this Complaint's allegations.

28.     The FCA alleged that the defendants in its action unlawfully promoted or operated "collective investment schemes" when they were not authorized to do so and that the investment schemes were sold through misleading statements.

6

29.     In February 2014, after holding a trial on the preliminary issue of whether the schemes were "collective investment schemes," the High Court of Justice, Chancery Division, ruled that they were.

30.     The FCA's public website provided updates about the progress of its action.

31.     On approximately February 17, 2014, the FCA's website announced the High Court's ruling on the preliminary issue: "The High Court agreed with the FCA that the schemes were unauthorised collective investment schemes and could not be lawfully operated by the defendants."

32.     Shortly thereafter, articles mentioning Haddow's role in the proceeding and in the alleged schemes appeared in the British press, including on the Internet.

33.     Haddow and certain other defendants appealed the judgment.

34.     In March 2015, the British Court of Appeal rejected the appeal.

35.     The FCA later announced on its website that "the Court of Appeal rejected the appeal and also found that the schemes were collective investment schemes."

## IV.     Haddow Began Operating InCrowd as an Unregistered Broker-Dealer in New York and Used It To Defraud Investors in Bitcoin Store.

### A.     Haddow Formed, Owned, and Controlled InCrowd.

36.     On November 24, 2014—just months after the British High Court's ruling—Haddow acted to incorporate Incrowd as its "sole incorporator."

37.     On the same day, Haddow purchased all of InCrowd's then-existing 5 million shares for $500.

38.     Haddow signed a statement warranting that he was "sufficiently aware of [InCrowd's] business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares."

39.     Also on November 24, 2014, Haddow became the sole member of InCrowd's board of directors.

40.     Haddow signed a certificate of incorporation dated December 3, 2014 to incorporate InCrowd in Delaware.

41.     On approximately December 11, 2014, Haddow opened a Bank of America account in InCrowd's name, with the last four digits 3084 (the "InCrowd 3084 Account").

42.     On the bank account opening form, which Haddow signed, Haddow listed himself as InCrowd's president.

43.     Haddow also listed himself as the only authorized signatory on the account.

44.     To open the account, Haddow provided Bank of America with a certified copy of an InCrowd corporate resolution dated December 11, 2014.

45.     The resolution listed Haddow as InCrowd's president and named him as the only InCrowd officer or employee authorized (a) to open a bank account in InCrowd's name and (b) to serve as an authorized signatory for such an account.

46.     On approximately January 8, 2016, Haddow opened another Bank of America account in InCrowd's name.

47.     On the bank account opening form, which Haddow signed on January 7, 2016, Haddow again listed himself as InCrowd's president.

48.     Haddow also listed himself as the only authorized signatory on the account.

49.     To open this second account, Haddow again provided Bank of America with a certified copy of a corporate resolution from InCrowd, this time dated January 7, 2016.

50.     The resolution was virtually identical to the December 11, 2014 resolution Haddow had sent Bank of America to open the prior account.

51.     In approximately June 2016, InCrowd filed a federal tax return for the tax year December 3, 2014 through November 30, 2015 ("InCrowd's 2015 Tax Return").

52.     On June 10, 2016, under penalty of perjury, Haddow signed InCrowd's 2015 Tax Return and declared that he was an officer of InCrowd and its president.

53.     For InCrowd's corporate address, InCrowd's 2015 Tax Return listed an address that was in fact Haddow's residential address in New York, New York.

**B.     Haddow Formed, Owned, and Controls Bitcoin Store.**

54.     On approximately December 15, 2014, Bitcoin Store was incorporated in Delaware.

55.     On January 16, 2015, Bitcoin Store's annual Delaware franchise tax report listed Haddow as Bitcoin Store's sole director.

56.     On January 20, 2015, Haddow—as Bitcoin Store's president and authorized officer—signed a certificate of amendment of Bitcoin Store's certificate of incorporation to allow Bitcoin Store to offer 20 million shares of common stock with a par value of $0.0001 each.

57.     On January 21, 2015, Haddow purchased all 20 million Bitcoin Store shares for $2,000.

58.     On approximately January 26, 2015, Haddow signed, under penalty of perjury, Bitcoin Store's application to the Internal Revenue Service for a United States employer identification number.

59.     Under the application form's heading "[n]ame of responsible party," Haddow listed himself.

60.     Haddow identified himself on the application form as Bitcoin Store's "Director."

61.     On approximately February 18, 2015, Haddow opened a business checking account in Bitcoin Store's name at Capital One, N.A.

62.     On the bank account opening forms, Haddow listed himself as Bitcoin Store's president and as the only authorized signatory on the account.

63.     On approximately May 13, 2015, Haddow opened a business savings account in Bitcoin Store's name at Capital One.

64.     On the bank account opening forms, Haddow again listed himself as Bitcoin Store's president and as the only authorized signatory on the account.

65.     On approximately August 3, 2015, Haddow opened another business checking account in Bitcoin Store's name, this time at Wells Fargo Bank, N.A.

66.     The Wells Fargo account opening application listed Haddow as Bitcoin Store's "Owner with Control of the Entity."

67.     The application listed the same address for both Bitcoin Store and Haddow: Haddow's residence in New York, New York.

68.     The account opening application stated that Bitcoin Store had only one employee and claimed annual gross sales of $480,000, as of December 31, 2014.

69.     Haddow was the only authorized signatory on Bitcoin Store's Wells Fargo account.

70.     On approximately January 15, 2016, Bitcoin Store submitted an annual Delaware franchise tax report, authorized by Haddow under penalty of perjury, that listed Haddow as Bitcoin Store's president.

**C.      Haddow Operated InCrowd as an Unregistered Broker-Dealer and Used It To Sell Bitcoin Store Securities and Other Securities To Investors.**

71.     InCrowd has never been registered with the Commission as a broker-dealer.

72.     Nevertheless, from approximately May 2015 to at least December 2015, Haddow used and controlled InCrowd to sell Bitcoin Store securities to investors.

73.     At InCrowd, Haddow employed a team of sales representatives.

74.     The sales representatives worked in Manhattan in an open office space with several tables and many telephones, and Haddow often sat at an open desk or in an office adjacent to the open office space.

75.     InCrowd's sales representatives cold-called prospective investors both in the United States and abroad.

76.     The sales representatives then solicited investments by telling potential investors about the merits of an investment in Bitcoin Store, sending the potential investors offering documents for Bitcoin Store, and following up with additional sales pitches.

77.     InCrowd offered investors both shares of Bitcoin Store's stock and Bitcoin Store notes, bearing an 8% annual coupon rate, convertible to shares of stock under certain terms (together, the "Bitcoin Store Securities").

78.     Based on these solicitations, InCrowd raised over $717,158.94 from approximately 50 investors who purchased the Bitcoin Store Securities from May 2015 through at least December 2015.

79.     InCrowd's sales representatives or administrator provided paperwork to these investors that typically directed them to send the funds for their purchase of Bitcoin Store Securities to the InCrowd 3084 Account that, unbeknownst to the investors, Haddow controlled.

80.     In return for their efforts, InCrowd's sales representatives received a fixed salary—for example, at least certain sales representative received a salary of $100 per work day—plus commissions based on the dollar amount of Bitcoin Store Securities the representatives successfully sold.

81.     Representatives' commissions typically exceeded 5% of the dollar amount of investments they each sold.

11

82.     InCrowd's sales representatives often received their salary and commission payments from InCrowd by check.

83.     Haddow signed the InCrowd sales representatives' salary and commission checks, which were typically written from the InCrowd 3084 Account.

84.     InCrowd's 2015 Tax Return, which Haddow signed, listed "commission fees" totaling $82,738 as a deduction.

85.     InCrowd sales representatives sold other securities using the same methods and similarly received commissions based on the dollar amount of securities sold.

**D.      Haddow and Bitcoin Store Defrauded Investors.**

86.     To sell Bitcoin Store Securities to investors, InCrowd provided potential investors with one of several versions of a "Private Placing Memorandum" concerning Bitcoin Store (collectively, the "Bitcoin Memoranda").

87.     Haddow, through Incrowd, controlled distribution of the Bitcoin Memoranda.

88.     The Bitcoin Memoranda provided a "[r]egistered address" for Bitcoin Store that was in fact Haddow's residential building in New York, New York, although the address on the Memoranda did not contain an apartment number or otherwise identify it as a residential address.

89.     Haddow's name did not appear anywhere in the Bitcoin Memoranda.

90.     One version of the Bitcoin Memoranda was dated March 2015 (the "March 2015 Bitcoin Memorandum").

91.     Another version of the Bitcoin Memoranda contained no date but appears to have been distributed in or after May 2015 (the "May 2015 Bitcoin Memorandum").

92.     At least some of the Bitcoin Memoranda included an introductory "Letter from the Directors"—purportedly signed by Bitcoin Store's "Chief Executive," Gordon Phillips (variously spelled "Philips" or "Phillips" in the Bitcoin Memoranda).

93.     The March 2015 Bitcoin Memorandum's directors' letter claimed that Bitcoin Store "will offer an easy-to-use and secure way of holding and trading Bitcoin."

94.     The May 2015 Bitcoin Memorandum's directors' letter claimed that Bitcoin Store "offers an easy-to-use and secure way of holding and trading Bitcoin."

95.     The May 2015 Bitcoin Memoranda directors' letters claimed that Bitcoin Store "commenced trading in December 2014 and with minimal marketing ha[d] generated gross sales of $1.95m up to 31ˢᵗ January 2015."

96.     The directors' letter in the May 2015 Bitcoin Memorandum further claimed that Bitcoin Store had "generated gross sales of…$5.61m for the three months to 30 April 2015 (cumulative $7.56m to 30 April, 2015)."

97.     The Bitcoin Memoranda described Bitcoin Store as "a US-headquartered group with a 100%-owned operating subsidiary in the UK – Bitcoin Store Limited" and claimed that the group "controls online operating outlets www.Bitcoinstore.nyc and www.Bitcoinstore.london."

98.     To describe Bitcoin Store's model for earning revenue from Bitcoin trades, the Bitcoin Memoranda generally claimed that Bitcoin Store earned revenue by charging a "flat 3%" commission on all bitcoin trades plus an annual account maintenance fee of "£20/$35."

99.     The Bitcoin Memoranda further described the type of investments Bitcoin Store was offering to investors.

100.    The Bitcoin Memoranda described "a private placing of 2,500,000 million [sic] shares at £0.50p each or $0.75c, representing 35 per cent of the enlarged share capital and valuing the whole group at £3.57 million or $5.35 million."

101.    The May 2015 Bitcoin Memorandum also described a second type of investment: a "Convertible Loan Stock alternative, priced at $1 or 66.5p per share, and bearing a coupon of 8% per annum." The memorandum represented that "[t]hese income-bearing promissory notes will be

convertible to ordinary shares on or after the first anniversary of their issue at the request of the holder and rank pari passu with the ordinary shares of Bitcoin Store Inc. All convertible promissory notes will convert to ordinary shares on the fifth anniversary of their issue, if not converted earlier on request or can be redeemed at face value at the end of the term."

102.     The May 2015 Bitcoin Memorandum further claimed that "the Proceeds of the equity and loan stock issues will be used for development and working capital" of the Bitcoin Store group.

103.     The Bitcoin Memoranda touted Bitcoin Store's purported management "team"—an "experienced team of leading investment professionals who come from various areas of the market"—of Gordon Phillips, Bitcoin Store's chief executive officer; Joseph Bilkhorn, Bitcoin Store's chief operating officer; and another individual, Bitcoin Store's finance director (the "Purported Finance Director").

104.     The Bitcoin Memoranda claimed that, before joining Bitcoin Store, Gordon Phillips had been the "Global Head of Currency and Options trading" at HSBC, the multinational banking and financial services firm, and an employee of Deutsche Bank, the German financial services firm.

105.     The Bitcoin Memoranda also claimed that Gordon Phillips held an "MSc in finance from Yale."

106.     The Bitcoin Memoranda similarly claimed that, before joining Bitcoin Store, Joseph Bilkhorn had been a "Chief Financial Officer and Head of Operations" at Credit Suisse, the Swiss financial services firm, and an "operations officer" in Deutsche Bank's Asia Pacific Region who was "responsible for business management and all operational functions including investment operations, finance, tax, risk, compliance, legal and human resources."

107.     The Bitcoin Memoranda identified the "Directors of Bitcoin Store Inc." as Gordon Phillips, Joseph Bilkhorn, and the Purported Finance Director.

108.    Finally, the Bitcoin Memoranda listed a law firm as Bitcoin Store's "Attorney" and a Brooklyn-based tax firm (the "Tax Firm") as its "Accountant."

109.    These representations and omissions in the Bitcoin Memoranda were false or misleading.

110.    In fact, Bitcoin Store has never had any operations.

111.    Nor has Bitcoin Store ever generated gross sales of over $1.9 million, much less of $7.5 million.

112.    For the year 2015, Bitcoin Store's bank accounts received less than $250,000 in incoming transfers, none of which appear to reflect revenue from customers.

113.    On its 2015 Delaware annual franchise tax report—which Haddow submitted as Bitcoin Store's president, under penalty of perjury, on January 15, 2016—Bitcoin Store represented that it had issued 20 million shares and had "$0.00" in "total gross assets" as of December 31, 2015.

114.    Nor did Bitcoin Store use investor proceeds from its stock and note issuances for development of and working capital of the Bitcoin Store group.

115.    From approximately May 2015 through December 2015, InCrowd raised over $700,000 from over fifty Bitcoin Store investors, who predominantly live in the United States.

116.    Of this total amount, investors remitted over $590,000 to the InCrowd 3084 Account—which, unbeknownst to the Bitcoin Store investors, Haddow controlled—at InCrowd's direction.

117.    Rather than remitting the funds to Bitcoin Store or its affiliates, InCrowd used the funds to pay its own operating costs, including InCrowd's sales representatives' salaries and commissions.

118.    Contrary to the Bitcoin Memoranda's claims, Gordon Phillips did not obtain any degree from Yale University and never worked for HSBC or Deutsche Bank.

15

119.     Similarly, Joseph Bilkhorn never worked for Credit Suisse or Deutsche Bank.

120.     On information and belief, Gordon Phillips is a fictitious person.

121.     On information and belief, Joseph Bilkhorn is a fictitious person.

122.     By omitting Haddow's name entirely while naming others as Bitcoin Store's directors and senior managers, the Bitcoin Memoranda concealed Haddow's involvement in Bitcoin Store.

123.     Furthermore, the law firm listed on the Bitcoin Memoranda as Bitcoin Store's attorney never advised Bitcoin Store in connection with its fundraising or the Bitcoin Memoranda.

124.     Nor did the Tax Firm listed on the Bitcoin Memoranda as Bitcoin Store's accountant review or prepare financial information for Bitcoin Store in at least 2014, 2015, and early 2016.

125.     Haddow knew or recklessly disregarded that each of these representations and omissions was false or misleading.

## V.   Haddow, Bar Works, and 7th Avenue Defrauded Investors.

### A.   Haddow Controlled Bar Works and 7th Avenue.

#### 1.   Haddow Founded, Owned, and Controlled Bar Works.

126.     On approximately July 24, 2015, Bar Works was incorporated in Delaware.

127.     On July 29, 2015, Haddow purchased all 20 million Bar Works shares for $2,000.

128.     On August 5, 2015, Haddow opened both a business checking account and a business savings account at Wells Fargo Bank in Bar Works' name.

129.     The account opening form for both accounts listed Haddow as the "[o]wner with [c]ontrol of" Bar Works, and Haddow signed a certificate of authority for the account as Bar Works' owner.

130.     Haddow listed himself on the account opening form for both accounts as the sole authorized signatory on the accounts.

16

131.    On December 21, 2015, Haddow instructed the Tax Firm to register Bar Works Management as a corporation.

132.    On approximately December 24, 2015, Haddow opened two accounts in Bar Works' name: a Chase business checking account and a Chase business savings account.

133.    Haddow signed the account opening forms for both accounts as Bar Works' president.

134.    Once again, Haddow listed himself on the account opening forms as the sole authorized signatory for both accounts.

135.    On approximately December 29, 2015, Haddow opened another account in Bar Works' name, a Citibank business checking account.

136.    The account opening application named Haddow as Bar Works' "President/ Chairperson" and represented that Haddow owned 100% of Bar Works.

137.    Haddow signed the application on December 29, 2015, in his capacity as Bar Works' president.

138.    On the same date, Haddow signed a resolution for Bar Works listing himself as the only authorized signatory on the account.

139.    On approximately February 5, 2016, Bar Works submitted an annual Delaware franchise tax report.

140.    The tax report, authorized by Haddow under penalty of perjury, listed only one officer and one director for Bar Works: Haddow.

141.    The tax report listed Haddow's Bar Works title as president.

142.    The tax report listed Bar Works' total gross assets as $1,500.00, as of December 31, 2015.

### 2.    Haddow Formed and Controlled 7th Avenue.

143.    On January 26, 2016, Haddow emailed the Tax Firm and asked: "Can you please set up a new company, Bar Works 7th Avenue, for a new property we are taking on."

144.    The same day, the Tax Firm filed 7th Avenue's certificate of incorporation, which Haddow signed as 7th Avenue's incorporator, with New York State.

145.    On approximately February 4, 2016, Haddow opened two Chase bank accounts for 7th Avenue: a business savings and a business checking account.

146.    Haddow signed opening forms for both accounts as 7th Avenue's president.

147.    Haddow was the only authorized signatory on the accounts.

**B.      Bar Works Offered Its Securities to Investors.**

> **1.      Bar Works Initially Sold Its Securities Through InCrowd But Later Used Other Marketers.**

148.    From approximately October 2015 to February 2016, Haddow used InCrowd to sell Bar Works securities to investors.

149.    InCrowd solicited investors for Bar Works and discussed the merits of the Bar Works securities with potential investors.

150.    During that time, InCrowd raised at least $67,000 from investors in Bar Works.

151.    From approximately February 2016 through at least April 2017, Haddow also used marketers to sell Bar Works securities to investors inside and outside the United States.

152.    Bar Works offered at least three types of securities: (1) shares of Bar Works stock, (2) notes, bearing an annual fixed interest rate for five years, which could be converted to ordinary shares of Bar Works stock at any time after the first year of issuance, and (3) leases coupled with sub-leases (collectively, the "Bar Works Securities").

153.    Bar Works marketed the Bar Works Securities using its website and private placement memoranda, both of which Haddow controlled.

154.    From approximately October 2015 through at least April 2017, Bar Works raised over $35 million from investors around the world, including in the United States, by selling the Bar Works Securities.

### 2.    Bar Works Primarily Sold Coupled Leases and Sub-Leases, Which Together Functioned Like Investment Notes.

155.    In a press release dated September 8, 2015 (the "September 2015 Press Release"), Bar Works claimed to be "a new venture in the work space market, aiming to bring real vibrancy to the flexible working scene by adding full-service work spaces to former bar and restaurant premises in central city locations."

156.    In the September 2015 Press Release, Bar Works announced that in October 2015 it expected to open its first location, at 47 West 39th Street in New York, New York (the "39th Street Location"), which would "offer up to 200 work units, plus meeting and networking areas."

157.    The September 2015 Press Release claimed that it would earn revenue by "charg[ing] a flat monthly fee to users of [its] work spaces"—customers such as "entrepreneurs, freelancers, and travelling employees" who wanted a workspace outside their homes—through monthly membership fees that included not only regular access to a workspace but also services such as internet access, photocopying, coffee, "[h]eavily discounted" alcoholic drinks, and technical support.

158.    The September 2015 Press Release stated that Bar Works expected to raise $440,000 in financing by "offering 20 work space units" at the 39th Street Location that it would offer "to investors on 10-year leases."

159.    From approximately October 2015 through April 2017, Bar Works primarily raised funds from investors by selling "leases" coupled with "sub-leases" on individual workspaces in at least five different Bar Works locations—often before Bar Works had opened the locations for business—in at least New York, New York and San Francisco.

160.    Bar Works generally offered investors a ten-year lease (the "Lease")—typically entitled a "Wealth Builder Lease Agreement"—on a numbered workspace in a particular Bar Works location named in the Lease.

161.    Bar Works or one of its affiliates typically served as the investor's counterparty—the purported "Landlord"—on the Lease.

162.    For example, Relief Defendant Capital typically served as the counterparty on workspace Leases at Bar Works' San Francisco location, and Defendant 7th Avenue typically served as the counterparty on Leases for workspaces at Bar Works' 47 7th Avenue South location (the "7th Avenue Location") in New York, New York.

163.    The Leases typically purported to include the signature (or a blank space for the signature) of Jonathan Black on behalf of the Bar Works' affiliate serving as the counterparty on the Lease.

164.    To purchase a Lease on an individual workspace, investors paid Bar Works or its affiliate an up-front, one-time purchase price (characterized in the Lease as "a single rent") generally ranging from $22,000 to $30,000, depending on the location of the workspace.

165.    Investors could purchase a single Lease covering one or more workspaces in the same Bar Works location or multiple Leases covering workspaces in different Bar Works locations.

166.    The Leases made clear that the Bar Works entity serving as the "Landlord" was "solely responsible" for "payment of all utilities associated with the Property," "payment of all taxes associated with the Property," "retaining insurance on the Property," and "maintaining the Property" in a lawful condition and "will retain the sole right to alter the Property."

167.    Along with each Lease, each investor also signed a sub-lease ("Sub-Lease")—typically entitled a "Wealth Builder Sub-Lease Agreement"—for the Bar Works workspaces set out on the investor's Lease.

168.    A Bar Works affiliate, often Bar Works Management, typically served as the investor's counterparty on the Sub-Lease.

169.    The Sub-Leases typically purported to include the signature (or a blank space for the signature) of Jonathan Black on behalf of the Bar Works' affiliate serving as the counterparty on the Sub-Lease.

170.    Under the terms of each Sub-Lease, Bar Works or its affiliate typically agreed to pay each investor back his full up-front purchase price for the corresponding Lease—which at least one Sub-Lease termed the "Total Investment amount"—at the end of the Lease's term, usually ten years.

171.    Under the Sub-Lease, the Bar Works affiliate agreed to pay the investor a fixed monthly "rental" fee, amounting to a percentage of the investor's original Lease purchase price, for the duration of the Lease's term.

172.    Bar Works typically offered a higher annual interest rate to investors who purchased Leases on more workspace units.

173.    For at least some time, Bar Works offered a 15% annual interest rate to investors who purchased Leases on two workspaces, a 15.5% annual interest rate to investors who purchased Leases on three workspaces, and a 16% annual interest rate to investors who purchased Leases on five workspaces.

174.    For example, one couple paid $125,000 to "lease" five workspaces in a single Bar Works location, and in return Bar Works Management agreed to pay the couple a monthly rental of $1,667 for all five workspaces—16.00% annual interest on the couple's $125,000 investment.

175.    Under the terms of each Sub-Lease, Bar Works or its affiliate typically agreed to pay each investor at least the designated monthly interest fee for the Lease's duration (typically ten years), regardless of whether Bar Works or its affiliate could obtain a paying customer for the

workspaces purportedly covered by the investor's Lease—that is, whether or not Bar Works received revenue from the relevant workspaces.

176.     Each Sub-Lease typically purported to offer some additional profit to the investor if Bar Works succeeded in increasing the price it charged a customer on the workspace purportedly covered by the investor's Lease, but the Sub-Leases typically provided no specifics about the initial price Bar Works would charge its customers for each workspace.

177.     The investors' funds were pooled together in at least three bank accounts in the names of Bar Works and 7th Avenue.

178.     Haddow controlled all of these bank accounts and the accounts' disposition of investors' funds.

179.     Of the investor funds Bar Works raised by selling the Leases and Sub-Leases, Haddow has transferred over $4 million to one or more accounts in Mauritius and $1 million to one or more accounts in Morocco.

**C.     Haddow, Bar Works, and 7th Avenue Defrauded Investors.**

180.     To offer Bar Works shares and convertible notes, Bar Works provided potential investors with a private placement memorandum (the "Bar Works Share-and-Note Memorandum").

181.     To sell Leases and Sub-Leases for particular Bar Works locations, Bar Works typically provided potential investors with one or more of various private placement memoranda specific to the relevant Bar Works location (collectively, the "Bar Works Lease Memoranda").

182.     The Bar Works Lease Memoranda typically contained similar content about Bar Works, in addition to information specific to the Bar Works location featured in each memorandum.

183.     At least one version of the Bar Works Lease Memoranda described Bar Works' Leases and Sub-Leases as follows: "Bar Works Wealthbuilder Program is the brand owned by Bar

Works™ Inc. in which investors can purchase their own workspace on a 10 year lease and lease this back to Bar Works™ Management Inc. (its wholly owned subsidiary) for a fixed rental income."

184.     Haddow determined the content of both the Bar Works Share-and-Note Memorandum and the Bar Works Lease Memoranda and controlled their distribution.

### 1.     Haddow and Bar Works Concealed Haddow's Control.

185.     The September 2015 Press Release announcing Bar Works' venture identified Bar Works' founder and chief executive as Jonathan Black.

186.     The press release contained a quote from Black and claimed that "Jonathan and his team have already secured US$500,000 of funding from a Silicon Valley backer."

187.     The press release touted Black's purported experience: "Jonathan has a background in finance and start-up ventures. He was a finance director/financial controller of two chains of bars in the UK (Regent Inns Plc – market value US$400m). He has also set up a number of new ventures, including recently 'Car Share', a car sharing APP."

188.     The press release also touted two other purported members of Bar Works' "Management Team": Chloe Miller, "Operations Executive," and a purported "Chief Finance Officer" (the "Purported CFO").

189.     The press release claimed that Chloe Miller "has a background in retail and is an accomplished entrepreneur in the retail and web design space, having launched a number of successful web based companies. Chloe is responsible for the day to day operations of each unit, ensuring members receive top quality service and that membership of each unit is optimized."

190.     The press release claimed that the Purported CFO "is an experienced finance executive. He is a qualified accountant (ACA) and runs his own practice. He will oversee the finance function of the business and ensure that the company stays within the constraints of its available resources and new units are built within budget."

191.    At least one version of the Bar Works Share-and-Note Memorandum similarly began with a "Letter from the Directors" purportedly signed by Jonathan Black as "Chief Executive, Bar Works Inc."

192.    The same memorandum identified Bar Works' directors as Jonathan Black, Zoe Miller, and the Purported CFO.

193.    The same memorandum repeated the language touting Black's experience that had appeared in the September 2015 Press Release.

194.    The same memorandum repeated the language touting Zoe Miller's experience that had appeared in the September 2015 Press Release, except that the press release used the name "Chloe Miller" and the Bar Works Share-and-Note Memorandum used the name "Zoe Miller."

195.    The same Bar Works Share-and-Note Memorandum virtually repeated the language touting the Purported CFO's experience that had appeared in the September 2015 Press Release.

196.    Like the Bar Works Share-and-Note Memorandum, the Bar Works Lease Memoranda typically began with a "Letter from the Directors," purportedly signed by Jonathan Black as "Chief Executive, Bar Works Inc."

197.    On approximately July 15, 2016, Bar Works issued another press release (the "July 2016 Press Release") concerning Bar Works' purchase of a restaurant in San Francisco to create a West Coast Bar Works location.

198.    The July 2016 Press Release described Bar Works' management team as Jonathan Black, chief executive; Zoe Miller, operations executive; and the Purported CFO. The press release also named another individual as Bar Works' new managing director.

199.    The July 2016 Press Release contained two quotes purportedly from Jonathan Black.

24

200.    Haddow's name appeared nowhere in the September 2015 Press Release, the Bar Works Share-and-Note Memorandum, the Bar Works Lease Memoranda, the July 2016 Press Release, or Bar Works' website.

201.    These representations and omissions in at least the September 2015 Press Release, the Bar Works Share-and-Note Memorandum, the Bar Works Lease Memoranda, the July 2016 Press Release, and Bar Works' website were false or misleading.

202.    In reality, Haddow founded, controlled, and owned Bar Works and its affiliates and controlled all the bank accounts in Bar Works' and its affiliates' names, as Haddow knew.

203.    On information and belief, Jonathan Black is a fictitious person, as Haddow knew or recklessly disregarded.

204.    On information and belief, "Chloe Miller" and "Zoe Miller" do not exist and were pseudonyms used by Haddow's wife, as Haddow knew or recklessly disregarded.

205.    The Purported CFO has never worked for Bar Works, as Haddow knew or recklessly disregarded.

206.    By omitting Haddow's name entirely, the September 2015 Press Release, the Bar Works Share-and-Note Memorandum, the Bar Works Lease Memoranda, the July 2016 Press Release, and Bar Works' website concealed Haddow's involvement in Bar Works, as Haddow knew or recklessly disregarded.

### 2.    Haddow, Bar Works, and 7th Avenue Misrepresented the Nature of the Workspace Leases.

207.    The Bar Works Lease Memoranda represented or implied that Bar Works and its affiliates would lease each workspace in each Bar Works location to only one investor at a time— that is, that an investor's Lease on a particular workspace was an exclusive lease and that no other investor could simultaneously lease the same workspace.

208.    For example, in its opening "Letter from the Directors," the version of the Bar Works Lease Memoranda for the Bar Works 7th Avenue Location claimed: "Bar Works™ Wealthbuilder Program is the brand owned by Bar Works™ in which investors can purchase their own workspace on a 10 year lease."

209.    The same memorandum later represented that "[t]he cost of each work space is US$25,000" and that Bar Works "will also offer a matched bargain facility where leaseholders can sell their lease units at any time if required – and perhaps buy more too!"

210.    The same memorandum also claimed that "[f]ull documentation and title [would be] provided for each work space unit" leased by an investor.

211.    Similarly, the Leases and Sub-Leases, which each covered a particular Bar Works location named by address, listed each workspace covered by the agreements using a four-digit number for each such workspace.

212.    For example, one Lease represented: "This Agreement will grant the Lease Holder [investor] a lease for five workspaces, workspace numbers 8238, 8240, 9180, 7794, 7710."

213.    In reality, as Haddow knew or recklessly disregarded, Bar Works sold Leases for more workspaces than existed in at least two Bar Works locations: the 39th Street and 7th Avenue Locations.

214.    The 39th Street Location had fewer than 70 workspaces (not including communal meeting areas) that could be "leased" to investors, as Haddow knew or recklessly disregarded.

215.    Yet between October 2015 and January 2016 Bar Works sold Leases for 112 workspaces at its 39th Street Location, as Haddow knew or recklessly disregarded.

216.    Similarly, the 7th Avenue Location had 95 workspaces (not including communal meeting areas) that could be "leased" to investors, as Haddow knew or recklessly disregarded.

217. Yet between February and May 2016 Bar Works and 7th Avenue sold Leases for 180 workspaces at the 7th Avenue Location, as Haddow knew or recklessly disregarded.

218. Bar Works and 7th Avenue therefore either sold investors Leases for non-existent workspaces or sold many investors Leases for workspaces already "leased" to other investors, as Haddow knew or recklessly disregarded.

### 3. Haddow and Bar Works Falsely Represented that the 39th Street Location Was Profitable within Months after Opening.

219. At least one version of the Bar Works Stock-and-Loan Memorandum claimed that Bar Works' 39th Street Location—the first Bar Works Location—was "already profitable."

220. Many or all versions of the Bar Works Lease Memoranda also claimed that the 39th Street Location was "already profitable."

221. In reality, the 39th Street Location never obtained sufficient membership fees or rental income from customers using the workspaces to pay Lease investors their guaranteed monthly interest fees and the overhead costs, including employees' wages, necessary to maintain the location, as Haddow knew or recklessly disregarded.

222. Until approximately April 2017, Bar Works and its affiliates paid the monthly interest fees of investors with Leases on workspaces in the 39th Street Location at least in part from the investments of later Bar Works' Lease investors, as Haddow knew or recklessly disregarded.

223. Bar Works and its affiliates stopped paying Lease investors monthly interest fees after approximately April 2017.

### 4. Haddow and Bar Works Falsely Claimed that Bar Works Had an Auditor.

224. At least one version of the Bar Works Stock-and-Loan Memorandum claimed that Bar Works' "Auditor" was the Tax Firm.

225.     Many or all versions of the Bar Works Lease Memoranda similarly claimed that Bar Works' "Auditor" was the Tax Firm.

226.     In reality, the Tax Firm never provided any audit services to Bar Works, as Haddow knew or recklessly disregarded.

227.     On information and belief, Bar Works never engaged an auditor, as Haddow knew or recklessly disregarded.

## VI.  Capital Purchased a Bar Works Property Partly with Lease Investors' Funds.

228.     In approximately June 2016, Capital purchased real property—located at 615 Sacramento Street in San Francisco, California—for $3.55 million, apparently for use as a BarWorks location.

229.     On May 6, 2016, to effectuate Capital's purchase, Bar Works wired $1.55 million to the transaction's escrow agent from a bank account in 7th Avenue's name that predominantly held funds from investors who had invested in Bar Works Leases.

230.     On June 7, 2016, a limited partnership provided a loan to Capital in the amount of $2,005,464.82—secured by a deed of trust that granted the limited partnership a security interest in the property—and wired those funds to the escrow agent for the property purchase.

231.     Haddow signed the deed of trust on Capital's behalf.

232.     On information and belief, the 615 Sacramento Street property is currently worth more than $2,005,464.82.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Against All Defendants)

233.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 232.

234.    Defendants Haddow, Bar Works, 7th Avenue, and Bitcoin Store, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

235.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

236.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 232.

237.    Defendants Haddow, Bar Works, 7th Avenue, and Bitcoin Store, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in

order to make the statements made, in light of the circumstances under which they were made, not

misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon other persons.

238.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert,

have violated, and unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Section 17(a)**
**(Against Haddow)**

239.    The Commission realleges and incorporates by reference here the allegations in

paragraphs 1 through 232.

240.    As alleged above, Bar Works, 7th Avenue, and Bitcoin Store violated Securities Act

Section 17(a) [15 U.S.C. § 77q(a)].

241.    Haddow knowingly or recklessly provided substantial assistance to Bar Works, 7th

Avenue, and Bitcoin Store with respect to the violations of Securities Act Section 17(a) [15 U.S.C.

§ 77q(a)] by each of them.

242.    By reason of the foregoing, Haddow is liable pursuant to Securities Act Section 15(b)

[15 U.S.C. § 77o(b)] for aiding and abetting the violations of Securities Act Section 17(a) [15 U.S.C.

§ 77q(a)] Bar Works, 7th Avenue, and Bitcoin Store.

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(Against Haddow)**

243.    The Commission realleges and incorporates by reference here the allegations in

paragraphs 1 through 232.

244.    As alleged above, Bar Works, 7th Avenue, and Bitcoin Store violated Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

245.     Haddow knowingly or recklessly provided substantial assistance to Bar Works, 7th Avenue, and Bitcoin Store with respect the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by each of them.

246.     By reason of the foregoing, Haddow is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Bar Works, 7th Avenue, and Bitcoin Store.

### FIFTH CLAIM FOR RELIEF
**Control Person Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(Against Haddow)**

247.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 232.

248.     As alleged above, Bar Works, 7th Avenue, and Bitcoin Store violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

249.     During the Relevant Period, Haddow controlled Bar Works, 7th Avenue, and Bitcoin Store and was a culpable participant in their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

250.     By reason of the foregoing, Haddow is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Bar Works, 7th Avenue, and Bitcoin Store.

### SIXTH CLAIM FOR RELIEF
**Control Person Liability for Violations of Exchange Act Section 15(a)**
**(Against Haddow)**

251.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 232.

31

252.    InCrowd acted as a broker-dealer without registering with the Commission, in violation of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

253.    During the Relevant Period, Haddow controlled InCrowd and was a culpable participant in its violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

254.    By reason of the foregoing, Haddow is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for InCrowd's violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against Relief Defendant Capital)

255.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 232.

256.    Capital used Bar Works' investor proceeds to purchase real property in Capital's name.

257.    Capital has no legitimate claim to these ill-gotten investor proceeds.

258.    Capital obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds or its equity in the property it purchased with the funds.

259.    Capital has therefore been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter an Order temporarily and preliminarily freezing the assets of Defendants, pending a final disposition of this action;

## II.

Enter an Order temporarily and preliminarily freezing the assets of Relief Defendant, up to the amount of the ill-gotten gains it received, pending a final disposition of this action;

## III.

Enter an Order requiring Defendants to repatriate funds and assets that are now located outside the Court's jurisdiction sufficient to effectuate a judgment against each of them for disgorgement, prejudgment interest, and civil penalties based on the unlawful activities alleged here;

## IV.

Enter an Order requiring Relief Defendant to repatriate funds and assets that are now located outside the Court's jurisdiction sufficient to effectuate a judgment against it for disgorgement and prejudgment interest based on the conduct alleged here;

## V.

Enter an Order requiring Defendants to provide a sworn accounting to the Commission;

## VI.

Enter an Order restraining and enjoining Defendants and Relief Defendant from destroying, altering, or concealing documents, pending a final disposition of this action;

## VII.

Enter a Final Judgment finding that Defendants violated the securities laws and rules as alleged against them here;

## VIII.

Enter a Final Judgment permanently restraining and enjoining Defendants and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating

33

Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### IX.

Enter a Final Judgment permanently restraining and enjoining Defendant Haddow and his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from violating or controlling any person who violates Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];

### X.

Enter a Final Judgment directing Defendants to disgorge, with prejudgment interest, all ill-gotten gains from the conduct alleged in this Complaint;

### XI.

Enter a Final Judgment directing Relief Defendant to disgorge jointly and severally with Defendants, with prejudgment interest, all ill-gotten gains by which Relief Defendant was unjustly enriched;

### XII.

Enter a Final Judgment directing Defendants to pay a civil monetary penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## XIII.

Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 30, 2017

Andrew M. Calamari
Lara Shalov Mehraban
Sandeep Satwalekar
Preethi Krishnamurthy
Maureen P. King
Christopher J. Dunnigan
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0116 (Krishnamurthy)