JUDGE SCHOFIELD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

   -against-

RENWICK HADDOW, BAR WORKS, INC.,
BAR WORKS 7ᵀᴴ AVENUE, INC., and
BITCOIN STORE, INC.,

                     Defendants,

   -and-

BAR WORKS CAPITAL, LLC,

                 Relief Defendant.
-------------------------------------------------------------x

**17 CV 4950**

COMPLAINT

17-CV-      (    )

JURY TRIAL
DEMANDED

### DECLARATION OF NEIL HENDELMAN IN SUPPORT
### OF PLAINTIFF'S *EX PARTE* EMERGENCY APPLICATION FOR AN
### ASSET FREEZE AND OTHER RELIEF

I, Neil Hendelman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am employed as a Supervisory Staff Accountant in the Division of Enforcement in the New York Regional Office of Plaintiff Securities and Exchange Commission (the "Commission"). My official duties with the Commission include participating in fact-finding inquiries and investigations to identify possible violations of the federal securities laws and assisting the Commission's litigation of enforcement actions. I have been employed by the Commission since June 2001. I hold a bachelor's degree in business administration from Baruch College.

2.    I am a member of the Commission's investigative team responsible for the investigation (the "Investigation") leading to the Commission's instant enforcement action.



RECEIVED
JUN 30 2017
U.S.D.C. S.D. N.Y.
CASHIERS

3. I submit this Declaration based primarily on my review of documents and information the Commission requested and received during the course of the Investigation, including public records, bank account records, and other documents produced to the Commission during the Investigation.

4. I submit this Declaration in support of the Commission's emergency application (the "Application") for an asset freeze and other relief against Defendants Renwick Haddow ("Haddow"), Bar Works, Inc. ("Bar Works"), Bar Works 7th Avenue, Inc. ("7th Avenue"), and Bitcoin Store, Inc. ("Bitcoin Store") (collectively, "Defendants") and Relief Defendant Bar Works Capital, LLC ("Relief Defendant" or "Capital").

5. Because the Commission submits this Declaration for the limited purpose of supporting this Application, I have not set forth each and every fact I know about the Investigation.

6. The following paragraphs describe and attach as exhibits relevant documents concerning the background, purported business, and operations of Defendants and Relief Defendant, including documents provided by investors and excerpts of sworn investigative testimony transcripts; provide my calculation of the number of workspaces available for lease and the number of certain workspaces apparently leased to investors by Bar Works or its affiliates, based on documents obtained by the Commission during its Investigation; and provide my summary of key bank accounts used by Haddow and my resulting summary charts.

I. **Background Documents About Defendants and Relief Defendant**

7. During the Investigation, the Commission obtained documents concerning the identity and background of Defendants and Relief Defendant, including the documents described below and attached as exhibits to this Declaration.[1]

---

[1] The Commission has redacted all the exhibits attached to my Declaration to comply with Federal Rule of Civil Procedure 5.2.

2

8. The Commission obtained a copy of Haddow's passport, which shows his country of citizenship and is attached as Exhibit 1.

9. The Commission reviewed bank account opening statements including a Wells Fargo account application that lists Haddow's personal address in New York, New York, which is attached as Exhibit 2.

10. The Commission obtained documents from the Internet concerning a court action filed in the United Kingdom by the United Kingdom's Financial Conduct Authority ("FCA") against Haddow and others (the "U.K. Action"): specifically, a February 2014 ruling by the High Court of Justice, Chancery Division in the U.K. Action, attached as Exhibit 3; a March 2015 decision by the British Court of Appeal in the U.K. Action, attached as Exhibit 4; and excerpts from the FCA's public website concerning the U.K. Action, attached as Exhibits 5 and 6. The Commission also obtained a letter from the Financial Conduct Authority, attached as Exhibit 109.

11. The Commission obtained articles from the British press concerning Haddow's role in the U.K. Action, an example of which is attached as Exhibit 7 and Haddow's disqualification which is attached at Exhibit 94.

12. The Commission obtained documents from the States of New York and California concerning the incorporation and/or ownership of the entity Defendants and Relief Defendant: specifically, an Application for Authority of Bar Works, attached as Exhibit 8; a 7th Avenue Certificate of Incorporation, attached as Exhibit 9; a Bar Works Management, Inc. ("Management") Certificate of Incorporation, attached as Exhibit 10; and LLC articles of organization for Capital, attached as Exhibit 24.

13. The Commission obtained documents from Pro Tax Center ("Pro Tax"): specifically, an InCrowd Equity, Inc. ("InCrowd") certificate of incorporation, attached as Exhibit 11; an InCrowd board meeting action by written consent, attached as Exhibit 12; a stock purchase

agreement, attached as Exhibit 13; an investment representation agreement, attached as Exhibit 14; an Action by Sole Incorporator attached as Exhibit 15; and an indemnification agreement, attached as Exhibit 16; Bitcoin Store articles and amended articles of incorporation, attached as Exhibit 17; an unsigned version of Bitcoin Store's annual shareholder meeting minutes, attached as Exhibit 18; a Bitcoin Store share subscription agreement, attached as Exhibit 19; an employer identification number application by Bitcoin Store, attached as Exhibit 20; Bitcoin Store franchise tax reports for 2014 and 2015, attached as Exhibits 21 and 22; Bar Works articles of incorporation, attached as Exhibit 23; a Bar Works franchise tax report for 2015, attached as Exhibit 95; unsigned minutes of Bar Works' annual board meeting, attached as Exhibit 26; a Bar Works share subscription agreement, attached as Exhibit 27; and a Bar Works incorporator action, attached as Exhibit 28.

14.     I also reviewed email requests related to Management and 7th Avenue from Haddow to Pro Tax, attached as Exhibit 29 and 75.

## II.     Investigative Testimony Transcript Excerpts

15.     The Commission staff took sworn investigative testimony from certain individuals formerly associated with Bar Works—Joseph Carrique, Brian Miller, and Jason Rivera—and a tax accountant, Inna Orel, apparently engaged by Haddow for specific tasks relating to InCrowd and Bar Works. Excerpts of Carrique's investigative testimony are attached as Exhibit 30, excerpts of Brian Miller's testimony are attached as Exhibit 31, excerpts of Jason Rivera's testimony are attached as Exhibit 32, excerpts of Inna Orel's testimony are attached as Exhibit 33 and Excerpts of Manhar Singh's testimony are attached as Exhibit 82.

### III. InCrowd

#### a. InCrowd's Operations and Finances

16. On June 23, 2017, I performed a search of the Commission's records and determined that InCrowd is not and has never been registered with the Commission as a broker-dealer.

17. The Commission obtained documents from various sources concerning InCrowd's business, including the documents described below and attached to this Declaration.

18. The Commission obtained documents produced by Bank of America related to InCrowd's accounts -3084 and -0552 including account opening statements, attached as Exhibit 88, and periodic bank statements.[2]

19. The Commission obtained documents from InCrowd, including: an InCrowd board meeting on consent, attached as Exhibit 89; a list of consultants, attached as Exhibit 90; and payments from the InCrowd account, a sample of which are attached at Exhibit 42.

20. The Commission obtained from Pro Tax additional documents concerning InCrowd, including a: 2015 federal tax return, attached as Exhibit 34; federal unemployment (FUTA) tax return for 2015, attached as Exhibit 35; letter dated December 11, 2014 from the Internal Revenue Service to Renwick Haddow, attached as Exhibit 36; Form W-2 for Haddow, attached as Exhibit 37; and general ledger, attached as Exhibit 38.

21. The Commission obtained from InCrowd's counsel a spreadsheet identifying, among other things, the dollar amounts sent to InCrowd by each investor, the dates of those investments, and the underlying investment for which the investor sent the funds, which is attached as Exhibit 39.

---

[2] At the direction of Commission counsel, I did not include the voluminous bank records that formed the basis of the bank analyses described in this declaration and attached hereto. These documents can be made available promptly if they would be helpful to the Court.

### b. InCrowd Financial Statement and Tax Return Review

22. As part of my role in this Investigation, I reviewed InCrowd's tax return and general ledger, attached as Exhibits 34 and 38.

23. My review of the general ledger shows that InCrowd includes in its income, Bitcoin Store – Other, amounts totaling $1,000,900, which InCrowd received on dates between April 27, 2015 and November 30, 2015. The general ledger also reflects Bitcoin Store chargebacks of $260,900. These are the same amounts that appear on the InCrowd 2015 tax return as income.

24. The general ledger does not reflect any amounts being sent to Bitcoin Store between the same December 2014 through November 2015 period.

### IV. Bitcoin Store

### a. Bitcoin Store Operations

25. The Commission obtained documents from various sources concerning Bitcoin Store's purported business and its communications with investors, including the documents described below and attached to this Declaration.

26. The Commission obtained documents from Pro Tax, attached as Exhibit 40, and a Bitcoin Store Employer Identification Number application, attached as Exhibit 20, showing that Bitcoin Store used at least the following addresses in Manhattan: 1150 Avenue of Americas, 6th Floor and 160 West 66th Street, # 33J.

27. The Commission obtained documents, including account opening documents, from Capital One, attached as Exhibit 41, and Wells Fargo, attached as Exhibit 2, where Bitcoin Store maintains or maintained bank accounts.

28. The Commission obtained documents from investors in Bitcoin Store, including the offering memoranda attached as Exhibits 43 through 44 and a call script from an anonymous source at Exhibit 84.

29. The Commission obtained documents from investors including investment application instructions, which is attached as Exhibit 45.

30. The Commission obtained correspondence between InCrowd and an investor including a cover letter and invoice for the purchase of a $10,000 Bitcoin Store convertible loan note, attached as Exhibit 46.

31. The Commission obtained Bitcoin Store share certificates provided to certain investors, which are attached as Exhibit 47.

32. The Commission obtained a check from Wells Fargo attached as Exhibit 110 and an investor application from an affiliate at Exhibit 112.

33. The Commission obtained documents from HSBC, Deutsche Bank, Credit Suisse, and Yale University concerning their search of their records for Gordon Phillips and/or Joseph Bilkhorn, which are attached, respectively, as Exhibits 48 through 51.

34. The Commission obtained from Pro Tax a draft copy of Bitcoin Store's 2014 tax return extension, which is attached as Exhibit 52.

35. The Commission obtained emails from Pro Tax, dated August 23, 2016 and Thompson Bukher LLP, dated June 1, 2016, which are attached as Exhibits 53 at 3 and 54.

36. Based on an online company records search I preformed, which is attached at Exhibit 107, Bitcoin Store U.K. was dissolved on March 1, 2016.

37. The Commission obtained from an investor a letter from Bitcoin Store, dated March 30, 2016, attached as Exhibit 55.

### b. Summary of Bitcoin Store Investors' Funds

38. During the Investigation, Commission counsel asked me to review and summarize key aspects of various bank accounts associated with InCrowd in order to determine whether InCrowd accounts reflected any transfers to Bitcoin Store.

39.     I reviewed and summarized these bank account statements for InCrowd Bank of America accounts -3084 and 0552 for the period from December 2014 to January 2017. To summarize the accounts, I used Excel functionality to aggregate all payments by person.

40.     I reviewed each of these aggregated payments. I did not note any amount transferred from these accounts to any Bitcoin Store account. Exhibit 106 reflects a summary for the InCrowd Bank of America account -3084 that I prepared and my conclusion that InCrowd received over $590,000 in Bitcoin Store investor proceeds for the period from December 2014 through February 2017.

41.     Exhibit 104 reflects another summary for the InCrowd Bank of America account -3084 that I prepared and my conclusion that InCrowd did not transfer any funds to any known Bitcoin Store account for the period from December 2014 through February 2017. The activity in the InCrowd Bank of America account -0552 consisted of one $100 transaction.

42.     Each of the summary charts I prepared in connection with this Declaration that includes investors identifies the investor by the first two to four initials of their name.

43.     Commission counsel also asked me to review three Bitcoin Store, Inc. bank accounts to determine whether these accounts had received any funds from InCrowd Equity, Inc. I reviewed the following bank account statements, the: Capital One account -3452 for the period from February 18, 2015 through August 4, 2015; Capital One account -7674 for the period from May 13, 2015 through August 4, 2015; and Wells Fargo account -4187 for the period from August 3, 2015 through October 23, 2015.

44.     I also reviewed Wells Fargo account -0893 for the period from August through October 2015, but I did not summarize this account because it maintained a zero or negative $6 balance for this period.

45. In order to determine whether any such transfer occurred, I aggregated all funds in and out of the account by person using Excel functionality.

46. I did not note any amount transferred to these accounts from any InCrowd account.

47. Exhibits 96, 97, and 98, reflect the summaries I prepared and my conclusion that InCrowd did not transfer any funds to any known Bitcoin Store account for the period from February 2015 through October 2015.

48. During my review, I also noted that the deposits into these accounts, collectively, did not exceed $250,000 between February and October 2015.

V. Bar Works

    a. Bar Works Background

49. The Commission obtained documents from various sources concerning Bar Works' purported business, including the business of its affiliates, and its communications with investors, including the documents described below and attached to this Declaration.

50. The Commission obtained documents from banks, including account opening documents and statements, for the following Bar Works bank accounts: (1) a Wells Fargo checking account -1172 and a savings account -7906, attached as Exhibit 56; (2) a Citibank operating account -0283, attached as Exhibit 57; and (3) a JP Morgan checking -1622 and a savings account -0770, attached as Exhibits 58 and 59.

51. The Commission obtained documents from banks, including account opening documents and statements, obtained for the following JP Morgan 7th Avenue bank accounts: a checking account-1379 and a savings account -7390, which are attached as Exhibits 60 and 61.

52. The Commission obtained documents, including account opening documents and statements, obtained for two Management accounts at Bank of America: account –0536 and –0549, which are attached as Exhibits 62 and 63.

53. The Commission obtained various documents from investors, employees, associates, on-line or affiliates, including leases and private placement memoranda, showing that Bar Works entities list addresses for at least the following locations: 47 West 39th Street, 41 West 46th Street, 47 Seventh Avenue South, 95 Chambers Street, and 16th & 8th in Manhattan; 242 Metropolitan Ave., Brooklyn, New York; 615 Sacramento Street, San Francisco and 6550 Sunset Boulevard, Los Angeles in California. These are attached as Exhibits 64 through 71 and 105.

54. The Commission obtained a spreadsheet of leases sold from a former Bar Works employee, which are attached as Exhibit 72.

55. The Commission obtained documents from the State of California entitled *Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing*, which is attached as Exhibit 73.

56. The Commission obtained documents from a title company, which are attached as Exhibit 92.

57. The Commission obtained, from associates of Haddow's, emails that were exchanged with Haddow, including: an email dated March 20, 2016, attached as Exhibit 74; an email dated September 28, 2015 which included a Q&A file, attached as Exhibit 25; and an email dated October 16, 2016, attached as Exhibit 76 as well as a press release, attached as Exhibit 79.

### b. Bar Works Documents from Investors

58. The Commission obtained documents from or relating to investors: including a Bar Works press release, dated September 8, 2015, attached as Exhibit 77; FAQ documents, attached as Exhibits 78A and 78B; Bar Works promissory notes, which are attached as Exhibits 80, 81 and 93; a lease and sub-lease, attached at Exhibit 83; an investor email between that investor and Bar Works, attached as Exhibit 85; and a Bar Works share and note memorandum, attached as Exhibit 91.

### c. Bar Works Floor Plan Analysis

59. During the Investigation, Commission counsel asked me to compare the number of desks available at two Bar Works locations located at 47 West 39th Street in Manhattan (the "39th Street Location") and 47 7th Avenue South in Manhattan (the "7th Avenue Location") with the number of workspace Leases Bar Works or its affiliates sold for those locations.

60. The Commission obtained floorplans for these locations, including a floorplan for the 39th Street Location, attached as Exhibit 86; and a floorplan included in the private placement memoranda described above and attached as Exhibit 66 (at page 12).

61. These floorplans either number or identify the number of workspaces in the 39th Street and 7th Avenue Locations. Specifically, the 39th Street floorplan, dated November 13, 2015, reflects 64 workspaces, and the 7th Avenue floorplan reflects 95 fixed desk spaces.

62. I then compared the number of workspaces on these floorplans with the number of workspace Leases sold for each location.

63. To do so, I reviewed a Bar Works spreadsheet the Commission obtained from a former Bar Works employee that tracks the number of Leases sold to investors between October 2015 and January 2016 for the 39th Street and between February and May 2016 for the 7th Avenue Locations, among others. This spreadsheet is attached above as Exhibit 72.

64. I counted the number of workspace Leases sold for each of the locations on this spreadsheet and calculated that that Bar Works sold 112 workspaces for 39th Street Location and 180 workspaces for the 7th Avenue Location.

65. I compared the number of workspaces on the floorplans and the number of workspace Leases sold for the corresponding locations and then created the summary chart attached as Exhibit 103.

66. As Exhibit 103 shows, Bar Works sold more workspace Leases than workspaces in the corresponding locations, based on these documents and my calculations.

### d. Bar Works Bank Account Summary

67. During the Investigation, Commission counsel asked me to review and summarize key aspects of various bank accounts associated with Bar Works, 7th Avenue and Management in order to determine what funds were received from and sent to investors.

68. I reviewed and summarized the following bank accounts in order to make this determination: Bar Works' JP Morgan account –1622 and Wells Fargo account –1172 and 7th Avenue JP Morgan account –1379. To summarize the accounts, I used Excel functionality to aggregate all payments by person.

69. I have summarized the funds transferred to and from these accounts. My summary charts, attached as Exhibits 99, 100, and 101, show that the Bar Works and 7th Avenue accounts collected over $37 million.

70. In order to determine which of these funds are from investors, I reviewed Bar Works leases' to determine the typical cost of investing.

71. Based on my review of various leases, which are attached above as Exhibits 65, 69, 70 and 83, lease prices typically appear to be $22,000 to $30,000. I identified these approximate amounts and multiples of these approximate amounts as investor funds.

72. Based on my review of the accounts, deposits consist of over $37 million in investor funds received into these accounts between October 2015 and December 2016.

73. As my summary chart, attached as Exhibit 102 shows, these accounts transferred $4 million to Mauritius and over $1 million to Morocco.

74. Based on my review, I further noted that the JP Morgan 7th Avenue account -1379 transferred over $1.55 million to a title company.

75. This amount consists of almost entirely of investor proceeds because all but approximately $200,000 of the credits in the JP Morgan 7th Avenue account -1379 were from investors.

## VI. Haddow's Fifth Amendment Affidavit

76. I have reviewed Haddow's Fifth Amendment affidavit, attached as Exhibit 87.

## VII. Other Court Actions

77. I have obtained a copy of a complaint and three asset freeze orders in another matter freezing the assets of defendants in this matter, attached as Exhibits 108 and 111.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on June 29, 2017
New York, New York.

_____
Neil Hendelman